Cases 13-3821, Lawyers Title Company LLC v. Kingdom Title Solutions, Inc. et al. And Case 13-3853, Lawyers Title Company LLC v. Kingdom Title Solutions, Inc. Oral argument, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Port for the appellant, Carl Sapa-Lee. Good morning, your honors. I request five minutes of rebuttal time, if I may. May it please the court, my name is Robert Port and I represent the appellants in this case and Carl Sapa-Lee's Lawyers Title Company. In this case involving improper competitive conduct of a trusted employee in a competing title company, the district court committed several errors in ruling on summary judgment and disposing on two primary issues that I want to raise in this oral argument and appeal. Particularly, the district court's summary disposition as a matter of law on the issues of proximate cause and whether or not the defendants possess the requisite malicious state of mind. These issues are fact intensive and generally left for a jury in the jury's province to determine whether there are inferences that can be drawn from the evidence presented, but the district court removed the issue from the jury on summary disposition and as a matter of law. In doing so, it applied the wrong improper standards of law and failed to draw inferences and construe the evidence in a light most favorable to lawyers title as it's required to do at the time. And for these reasons, we're asking the court to reverse these summary judgment and judgment as a matter of law rulings. I'd like to address three primary issues. First, the district court's grant to Ms. Bittinger of partial summary judgment on the issue of proximate cause. Second, the district court's grant of summary judgment in favor of kingdom title on the issue of civil conspiracy where the judge found that there was no evidence of legal malice possessed by defendant kingdom title. And third, the judge's removal of the issue of punitive damages from the jury at the close of all evidence, finding there was no evidence of actual malice under the punitive damages standard for Ms. Bittinger. As it relates to the partial summary judgment, this is what lawyers title is referred to as the excluded causation theory. There are essentially two types of wrongful conduct alleged by lawyers title. Tortious interference, one type of conduct, and breach of duty is another type of conduct. And granting partial summary judgment for Ms. Bittinger, the court essentially said you can get damages for the tortious interference conduct that occurred in a very limited window between June 6th and June 22nd, but you can't get any damages for the breach of fiduciary duty and breach of duty of loyalty by recruiting her coworkers. The judge essentially held that although this is a highly fact-intensive issue, that there simply was too tenuous a theory of causation to get the issue to the jury. A lawyer's title's theory of causation in this respect is very straightforward. Ms. Bittinger breached her duties of loyalty and fiduciary duty by competing against her current employer when she recruited her coworkers for and on behalf of a competitor to leave and go compete. That was the breach of duty. This type of competition has been found in many cases to constitute a breach of duty of loyalty and fiduciary duty. Despite the fact that, and the point being that she breached her duty by recruiting the employees. Because of that breach, because of that improper recruiting, the employees left and the customers followed. It's a straightforward issue of causation. At that point, are we distinguishing that your position is that it would have been okay if she quit, or at least for these purposes you'd be willing to take that, but she couldn't ask her coworker to go with her? Thank you, Your Honor. It would have been okay if she had quit by herself. And there were two issues raised in that question. One is, why did she quit? And two is, why did her coworkers quit? The evidence of the record showed that she quit because of her breaches of duty. She wasn't going to leave, the evidence showed, if she couldn't round up the other employees to go with her. Her compensation at the new company as a 30% part owner was based on 30% of the profits was going to be her. She was giving up her commission-based salary in exchange for her 30% ownership in the new competing enterprise. And she needed assurances from Kingdom Title that she could recruit her coworkers, and she needed assurances from her coworkers that they were going to go with her, or else she risked losing her customer base and book of business and thereby losing her compensation. The evidence showed that this was the case. She originally, in May, this occurred between May and the end of June of 2012, she originally offered the position, asked her coworker if she would leave with her. Her coworker, in her own words, freaked out and said she wouldn't leave. And at that point, Ms. Bittinger called back the Kingdom Title manager, the owner, Mr. Moore, and said, well, I'm not going to go now, the implication being my coworker's not going, I'm not going. The solicitation continued, Mr. Moore continued to recruit Ms. Bittinger, and throughout the entire recruiting process, Ms. Bittinger continued to gain assurances from Mr. Moore that he could recruit Ms. Bittinger, I mean Ms. Frateroli, her coworker, that she would have a job at Kingdom Title. At one point, Mr. Moore authorized Ms. Bittinger to make an offer for a salary that she had negotiated with Mr. Moore. They discussed health insurance. She made the offer a second time on June 6th, and this time Ms. Frateroli accepted it, but she went through all these machinations of getting assurances that she could have a job on Mr. Moore's end and making assurances that Ms. Frateroli would come with her because she knew she needed her. She didn't want to risk losing a percentage of the customer base. In terms of Kingdom's relationship with Frateroli, is there anything wrong with them trying to hire somebody away from a competitor? Absolutely not. They certainly have a privilege to compete as a competitor in the industry, and if they would have approached Frateroli and if they would have made her an offer, that would have been okay, but they didn't. Instead, they used. Only because Bittinger, who herself could also have discussed moving and taking that offer. It's only because Bittinger then talked to Frateroli that that becomes a conspiracy? Well, if you'd like, I'll go to the conspiracy issue. Don't if I'm not there yet. So this is only for the duty of loyalty? Yes, and the duty of loyalty and fiduciary duty by recruiting, by breaching that duty and recruiting the coworkers, the coworkers left, Bittinger left, and the customers followed. It's this causation theory that the court excluded, and it's this very causation theory that this court affirmed in the Chicago Title v. Magnuson case. Very similar facts, almost identical. In that case, Mr. Magnuson breached his duty not to compete by. Wait, wait, wait, but there wasn't a duty not to compete here. There actually was a duty not to compete while she was employed with the company. So in this case, Ms. Bittinger had a common law duty not to compete as a fiduciary and as an employee. In that case, in the Magnuson case, he had a contractual duty not to compete. Same duty was not to compete. So your argument is that by these essentially two coworkers talking about exercising their rights, that breaches the duty of loyalty. They did more than talk about their rights. The evidence showed that Ms. Fraterolic, that when Ms. Bittinger met with Mr. Moore and another coworker of Mr. Moore's, Pam Keenan, they gave her a sales pitch, as you do when you're recruiting somebody. The evidence clearly showed, and it's in the deposition testimony that we cited, that Ms. Bittinger went back and talked to Ms. Fraterolic and gave her the same sales pitch. So they were more than just discussing the possibility of leaving. She was soliciting Ms. Fraterolic, and that has been considered competition in both the Magnuson case, other cases, a very similar case in the Arizona Court of Appeals where the same causation theory was also affirmed. And in the Magnuson case, this court... Just to wrap this up then, Kingdom could have solicited both of them and even told them the wonders if they both came, but if one of them was more enthusiastic than the other, Ms. Bittinger in this case,  that she needed to remain mum about what both of them were facing. Well, there's a fine line between remaining mum and actively soliciting your coworker on behalf of and with the authorization of a competing enterprise after you've already negotiated salary and benefits for that person. Was that the problem, that she wasn't just advocating come with me? It's that she was advocating on behalf of the company? That's certainly part of the problem. Had she merely asked her to come with her, that may have been a closer call in this case, but that's not what happened. She recruited her coworkers. She talked to them about the benefits of the new company, the same things that they had talked to Ms. Bittinger about when they were recruiting her. And this is exactly what the court said. This causation theory is the same thing in Magnuson. When Magnuson recruited Chicago Title employees, those employees were under post-employment non-compete. Those employees that he recruited were also at will. But this court ruled that that recruiting of at-will employees with no post-employment non-competes, that those actions were properly considered on the issue of proximate cause for the damages that Chicago Title suffered as a result of that improper recruiting. And it's the same thing that happened in the Arizona case, even more apt because the person who was doing the wrongful conduct in Arizona, Ms. Pope, was the branch manager. She was also breaching her fiduciary duties by rounding up the employees and moving them. Same thing. She negotiated salaries. She rounded up the employees. They all left on the same day. Admittedly, it was on a grander scale. It was on the order of 20 employees. But this is the same exact conduct, just in a smaller scale. And it's the same causation theory that this court has affirmed. As it relates to the civil conspiracy. Counsel, you will see that your red light has come on if you want to reserve your five minutes. Yes, thank you, Your Honor. I'll reserve my five minutes. Thank you. Good morning, judges. My name is Nicholas Evanch, and I represent Kingdom Title. In this case, who is the subsequent hiring employer? As Mr. Port rightfully acknowledges, these are at-will employees. They were free to go with my client. The facts, though, are not as plaintiff's counsel would spin it for disargument purposes. Basically, Brian, sole practitioner, sole owner of this company, Kingdom Title, wanted to hire Sarah. Met Sarah, asked to hire her. She was the salesperson that he would want to have in the Medina County. She initially turned him down. That is true. He called her again about joining him. And this time, though, he said, come join our company and we'll form a separate company. At which point, she agreed and accepted. It was only at that point, after she accepted the job, that she said to Brian, would you also consider hiring some of these other ones? I'm worried about these other employees because if I'm gone, they're going to be gone. It was only a short time, a year earlier, where Lawyer's Title was looking to get rid of Debbie. Now she is this very valuable, revenue-generating employee. Not the facts in this case at all. There was no proof at the summary judgment stage that any employees or that any customers left to go with Debbie. Sarah was the salesperson. Sarah was the one Brian was interested in hiring. The argument that, and we're talking about a $5 billion-a-year company, 10,000 employees, 800 offices around the country. We're talking about an at-will employee, no non-compete. What Judge Gwynne, and obviously we're here to argue but also agree with Judge Gwynne throwing this case out, asked to us on the claim of malicious interference. There was no malice here. There was no intent to injure. It was merely hiring an at-will employee who has the right to leave. I would be surprised to hear an employer come before this court and say, well, that at-will employee, I can let that person go, but that person can't leave us. They're not arguing that. They're also not arguing, which I think is very significant, Judge Boggs mentioned it, that there's nothing wrong with had Brian asked to hire Debbie. But Brian didn't care about hiring Debbie. Debbie just came along after Sarah agreed to take the job, and I think that's very, very crucial here in understanding the facts. There was no package deal. There was no proof, and if you go through plaintiff's brief, you will see no cite to any evidence that this was a package deal and that Sarah would only come if Debbie comes with her. That's not the facts, and they don't cite to any facts that. That's their wishful thinking, but that's not the facts in this case. Who is referred to as the revenue producer? Sarah is the revenue producer. The other person is a clerical person. She's the one that would gather up the paperwork at a closing. The escrow, they call it officer, but she's not an officer of the company. She is the one that gathers up when you close on a house, gets the papers, disperses the funds. That is Debbie's job. She's not a revenue-generating employee. Debbie's Frateroli. Sarah's Bittinger. Yes. Sorry, Judge. Yes, correct. Are there allegations that Frateroli was the revenue producer? Well, they're saying any employee, any employee that satisfies a customer and the customer then will come back because that employee has been a good company, is a revenue-generating employee. That's their argument. But Debbie doesn't go out and solicit anybody. There was no proof before Judge Gwynn that the hiring of Debbie caused any customers to go, and they're not making that argument today. What they'll cast the argument into is because Sarah and Debbie both left, and really because Sarah left, customers followed. They acknowledge this is a relationship-type business, that competitors, and them including, will hire a salesperson from other competitors. That's the nature of the business. That's okay. If they want to protect themselves, they should have a non-compete. Now, they're also arguing today that had Brian waited two weeks or a week and a half, approached Debbie, that would be okay. That's not the law. The law is not that clear. But according to Brian, Brian didn't even interview with Debbie. Basically, Sarah said, hey, if I go, she wants to go, can I bring her along? And the answer was, sure. What do you pay your escrow officers? Around $46,000 a year. Fine. And that was the extent of Brian Moore's knowledge of Debbie Frateroli. So if she wanted to come, okay. There was no contingent offer. And to help this court sort through all this paperwork, if you just look at the affidavit of Brian Moore and the affidavit of Sarah Bittinger that was presented to Judge Gwynne at the time he made his decision, you'll see Sarah made the decision to leave. And then after that, Debbie said, hey, if you want to go, you can go too. Debbie could have stayed. That was not of concern. There was no malicious combination to injure another. Since he hasn't talked about conspiracy, I'm going to guess at what he may say. But Judge Gwynne. I'm going to guess that your red light is on, which means that your co-counsel. I don't want to cut into his time. Thank you. Thank you, Your Honor. Thank you and good morning. My name is Frank Wichey, and I represent Sarah Bittinger in this matter. The first thing that I'd like to point out is a misnomer that is a phrase, the excluded causation theory, not excluded at all. The theory about Sarah Bittinger asking Debbie Frateroli to come work with her at Kingdom Title was evidence in the trial. They were free to make whatever arguments they wanted about it. It was throughout the trial. It was the theme of their case. Now on appeal they're calling it the excluded causation theory is just not correct. I would like to talk about the cross appeal for a moment, and that touches on some of the issues regarding the summary judgment motion. When this case began, lawyers' titles sought hundreds of thousands of dollars and lost profits as if there was some type of a non-compete agreement that was perpetual into the future. We felt it necessary to try to limit exactly what damages could be asked for here and limit those damages to those that were approximately caused by an actual tort. The two torts or three that were left for consideration were breach of loyalty, breach of fiduciary duty, and business interference. However, as to Sarah Bittinger, these causes of action could only come from conduct while she was employed. Those duties, the duty of loyalty, fiduciary duty, and the business interference were duties that she had only while she was employed. After employment, she was free to interfere fairly on a competitive basis, and she owed no duties. The damages must extend then from conduct which Ms. Bittinger participated in while she was employed with lawyers. The judge made a correct decision as a matter of summary judgment to limit those damages. There was some evidence in this case that there may have been some loyalty issues. That dealt with six particular transactions where there was actual evidence. Is there a reason you say six when the judge seemed to say five? I think maybe at trial there was another one that was presented, and maybe as a part of the summary judgment there was five. These transactions, though, at trial totaled, and this was the number that lawyers gave, $3,263. But there was evidence there. There was a customer that said, Sarah, I understand you're leaving to go to Kingdom Title. Can I place my order with Kingdom Title so you can close it there? Sure, go ahead and do that. While she was employed, probably wasn't the thing to do. Do you agree, though, that actions while still employed up until June 22 could have consequences later on, so that you could potentially present evidence of damages that actually occurred later on? I 100% agree with that. However, it needs to be tied together as a matter of causation. For instance, what evidence did they provide? They just provided that lawyers' title had generally lower profits after Sarah left and that customers left, but they never tied that lower profit into anything that Sarah did while she was employed. The jury verdict of $13,000, I guess, and change, did that tie to any particular set of evidence? Obviously, they put in a lot more. They had $77,000, I thought, or something. Yeah, that's correct. They just seemed to pick that as... They just picked it. Essentially, what they did is they put the lower profits in. They said because Sarah hired or sought to hire Debbie Frateroli, that's the concept they have. Besides the hiring, what about the deleting of the e-mails and the contacts, that you might say that didn't cause much trouble? Right. What did the jury find that it did cause some damage to them? Nothing was tied to that. In fact, there was no evidence that that caused any type of damage at all. First of all, the deleting of e-mails was in the employee policy manual. That was something that the employees were supposed to do on a regular basis. As they closed deals, they were to take their e-mails and delete them. Did she erase the database? What she erased was her personal contact list. Now, it was on the computer of lawyer's title. At the time, she didn't view it as property of lawyer's title. There was testimony that it took four days to get it back, to recreate it. That's what they testified to. They never put that in term of any type of damage, any type of monetary damage whatsoever on that. Essentially, what their theme of the case was, and they did. They throw out all these possibilities, but really what they keep coming back to are statements like this. Statements that they say that this is a people business. Even in their own brief, they say this is a relationship business. People like doing business with people they like. It is customary. This is their evidence and the theme of their case. It is customary for customers, they say, to follow the employee when they move to a new company. They called Sarah a surrogate for the customers. So they did provide the most likely reason that the customers left. They liked Sarah Bittinger. That's the reason that the customers left. That's not a tort. There was no link to any tortious conduct of Sarah Bittinger for any of the damages which were at play in this whole matter. Concerning the hiring of Debbie Frateroli, again, not one customer was put on the stand that said, I went to Kingdom Title because I was so enamored with the escrow services that Debbie Frateroli performed. There wasn't. Let me just get this straight. There are the five transactions that add up to the 3,000-somewhat figure. That's correct. Okay. Those were ones where it was established that there was some sort of writing of some sort during that period of time. Correct. Okay. Then there was testimony that covered the next three months, right? There was evidence of the business or profits that Lawyer's Title made, and the argument was that the profits were lower. And it was lower because, and then they start throwing out all these concepts, kind of running them up the flagpole to see if anyone salutes. But they provided no evidence that anything other than the $3,200 figure. The evidence, I thought, was that contracts that would have been taken in June would come to fruition in July and August, right? There was some evidence of the life of a deal. But they didn't say any of the deals when they came to life, or they did not tie any of those deals except the five. They did. With those five, they had some evidence that there was a communication. They had something in writing. It doesn't mean that there weren't. Not always in writing. They had some. Some of it was verbal. Some evidence, indeed. Okay. But there may very well have been other calls that came in to her that were not documented. There was no evidence of that. Well, just hear me out, okay? Sure. If calls in June show up in revenue in July, okay, then if she didn't do anything, then their revenue in July should have been solid, and it should have dropped off after that. If the money doesn't show up until the ‑‑ if she had done everything and accepted all of the orders and left them there for lawyer's title and left, presumably July would have been a fine month at lawyer's title because they would show up the next month. Well, the largest months in the title insurance business are in the springtime and the early summer. You know, things, transactions start occurring at that point in time. That's the busiest time. So there is usually a natural drop off of revenue. So there certainly are other explanations for that. Well, there are, but that was up to the jury. The jury didn't buy it was the whole amount, but they bought that there was ‑‑ that there were other diversions that she didn't get caught red‑handed on. Right? I mean, isn't that the most plausible explanation? No, I don't think so. Where do you think they came up with the number? I don't know. And I think that's why the Rule 50B motion should have been granted because there was no substance behind any number other than $3,268. So if they had come up with $30,268, it would have been okay? $3,268. Oh, $3,268. It would have been ‑‑ I certainly couldn't make a Rule 50B motion on that because there was some evidence and a reasonable jury could come to it. And that's how we got to $13,028. In our view, the judgment should be reduced by $9,765 to get it to the $3,263 figure. According to the Chase, what you're saying is anything above that $3,000 figure is just speculation on the part of the jury. Pure speculation. Nothing of substance behind it. Thank you. Rebault. Thank you, Your Honors. Thank you. I want to take up that last point on the damages issue. There was plenty of evidence, specific evidence, direct evidence, as to how the jury could have come up with that number. There was evidence in the record that Ms. Bittinger called at least three customers before she left. And there was evidence that those three customers, part of the six transactions, were from the six that we know of, were directly from one or two of those customers. So we have evidence that she contacted the customers, and between June 6th and June 22nd before she left, orders started flowing right there. What we also had was the open and closed order report from Kingdom Title, which limited only to the former customers of Lawyer's Title. So there's an open and closed order report only listing Lawyer's Title's customers, what their business was for the entire year of 2012 at Kingdom Title. All of those customers had almost zero transactions before June 6th, before the date she accepted the offer. From June 6th through the end of June, there were about 20 transactions from customers of Lawyer's Title that magically started opening at Kingdom Title. That in and of itself is sufficient for the jury, drawing all reasonable inferences, to say that Ms. Bittinger, by contacting these clients, steered the transactions over to Kingdom Title. What was the evidence that that would have yielded in profit? So the evidence was there were about, as we discussed, about five or six transactions, about $3,200 in profits. The jury had that information so they could come up with a per-profit, per-transaction profit. All they had to do was take the per-transaction profit, multiply it by the 20 or so transactions between June 6th and the end of June, and that comes out to about $10,000. When you add that to the three, that's, now we're getting into the ballpark, we're almost exactly what the jury awarded. So the evidence was there and the causation was there. And that's using only the narrow causation that the judge allowed to get to the jury, just that conduct within that short window. Mr. Ritchie says that the excluded causation theory is a misnomer, but the court specifically said in the summary judgment ruling that Bittinger and Frateroli may be liable for damages caused by the solicitation of customers. That's the direct solicitation. But not for lost profits, simply because they left. Of course, the court misconstrued the causation theory. It wasn't simply because they were left, but because she breached her duties during her employment, which caused her to leave. Isn't that why the judge put a temporal limit on it? Because if the life of a transaction is three months, then anything after that is due to the fact of their leaving, not the fact of their breaching their duty while they were there. So the question becomes, why did they leave? And if they left because of a breach, then that caused the customers to leave. Forever? No, not forever, for a reasonable time. This is the jury question. This is what happened in Magnuson. But then you're only talking about, you've already said that Bittinger could leave. Pardon me? You've already said that Sarah could leave. So the only breach that could yield to damage is Frateroli. And what's the evidence that she was revenue producing? Well, first of all, they introduced sort of a misnomer. The issue isn't revenue producing. The issue is revenue attached. The evidence is clear at deposition, and this was presented at summary judgment, that Frateroli conducted the day-to-day business of the operations. She interacted with the customers. The customers knew her. They trusted her. She solved all the problems. They liked working with her. That was the evidence from Sarah Bittinger at deposition. This is why Sarah needed Debbie to leave, so she wouldn't give the lawyer's title an opportunity, a fair opportunity, as they would have had, to make a counteroffer to at least keep Debbie and at least keep some of the business. Instead, and in secret, she breached her duty of loyalty by competing against her employer, rounding up the employees to leave. Again, the evidence was that she wouldn't have left. Neither of these employees would have left if she hadn't breached her duties and rounded up all the employees and negotiated with the competitor. It's not just the leaving that caused the injury. It's the breach of duty by competing that caused them to leave and therefore caused the injury. It's exactly the same as Magnuson. It's exactly the same as Pope. As for the civil conspiracy, the court applied the wrong standard for malice. In its ruling, the court said that there was no evidence of malice and defined malice explicitly as intent to injure. That's actual malice. That's not legal malice as defined by the Gosden Court. Legal malice is also referred to as implied or inferred malice. It's legally proper for the jury to infer and impute malice based upon the evidence of the other elements of conspiracy. Counsel, if I could ask one question, just going back to your monetary theory, just to make sure that I have this right. We had five or six specific transactions that are identified, Avon, Lake, Route 43. You then referred to 20 contracts that were opened with Kingdom from ex-Tidal customers by the end of June, and those do not include the five or six that are specifically identified? That's correct. Okay, so you get basically 20 is 3 times 6 or 3 times and a bit, and 3 times 3,200 is pretty close to the extra damage. Exactly. Thank you, Counsel. How would the outcome—the jury had a chance to award that 34,000 plus the 3,000  How would the damages have been different if these claims had gone to the jury? Well, the jury was precluded from hearing evidence and argument that— you know, we had a burden to prove causation, and we weren't allowed to present evidence and argument that the breach of duty in recruiting Bittinger caused the loss of business, which continued to some point in the future, which would have been up— The loss of the duty in recruiting Bittinger, I thought— I'm sorry, in recruiting Frateroli. Yes, correct. We weren't allowed to present that evidence. We weren't allowed to present that argument as a proximate cause, and the jury couldn't consider it. Now, if you look at the Magnuson case and the Pope case, where this court affirmed that causation theory and the jury did have an opportunity to consider it, in those cases, they awarded lost profits in the area of approximately two years into the future, and at that point apparently found that anything beyond that was too disconnected and too attenuated. But they had the opportunity to make that decision for themselves. Defendants want to draw all inferences in their favor. A judgment is a matter of law, and summary judgment, the inferences all have to be drawn in lawyers' titles favor. So the problem with the case is that Bittinger didn't have the right to recruit Frateroli. Correct. It was a clear breacher of her duty of loyalty and clearly competing with her employer. Thank you, counsel. The case will be submitted. Thank you very much. Clerk, may we call the next case?